COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-280-CR

JODIE MOORE APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

In five issues, appellant Jodie Moore appeals his conviction for aggravated robbery with a deadly weapon.
(footnote: 2)  We affirm.

BACKGROUND

The State charged Appellant with committing the aggravated robbery of Jaime Hernandez.  He pled not guilty.  During the guilt-innocence phase, the jury heard testimony that Appellant and three other young black men stole Jaime’s necklace, ring, and wallet, as well as equipment belonging to Jaime’s employer, Rene Cadena, at gunpoint, from the construction site where Jaime and his co-worker, Angel Hernandez, were working.
(footnote: 3)  Jaime identified Appellant from a photo lineup on the day of the robbery but was unable to identify Appellant at trial.  Rene testified that he saw his equipment being unloaded by four young black men at a nearby pawn shop and summoned the police.  Rene identified Appellant in court as one of the four men at the pawn shop.  Juan Rodriguez, the pawn shop employee, picked Appellant out of the photo lineup presented to him a few days after the offense.

Appellant requested a charge on the lesser-included offense of theft.  
See
 
Tex. Penal Code Ann. 
§ 31.03(b)(2) (Vernon Supp. 2006).  The trial court denied his request, and the jury found Appellant guilty of aggravated robbery with a deadly weapon.  During the punishment phase, the jury heard testimony from, among others, Donald Martin, who identified Appellant from the same photo lineup presented to Jaime as the man who stole his van the day before the robbery.  The jury assessed Appellant’s punishment at forty-five years’ confinement.  The trial court rendered judgment on the verdict and sentenced Appellant accordingly.

SUPPRESSION

In his second and fourth issues, Appellant argues that the trial court erred by denying his motions to suppress photo lineup identifications of him by Jaime in the guilt-innocence phase and by Donald Martin in the punishment phase.  He moved to suppress both lineups before trial, complaining that the identification process in each was impermissibly suggestive.

Standard Of Review

We review a trial court’s ruling on a motion to suppress evidence under a bifurcated standard of review.  
Carmouche v. State
, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); 
Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court’s decision, we do not engage in our own factual review.  
Romero v. State
, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); 
Best v. State
, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.  
State v. Ross
, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); 
State v. Ballard
, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).  Therefore, we give almost total deference to the trial court’s rulings on (1) questions of historical fact, even if the trial court’s determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.  
Montanez v. State
, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006); 
Johnson v. State
, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); 
State v. Ballman
, 157 S.W.3d 65, 68 (Tex. App.—Fort Worth 2004, pet. ref’d).  But when the trial court’s rulings do not turn on the credibility and demeanor of the witnesses, we review de novo a trial court’s rulings on mixed questions of law and fact.  
Estrada v. State
, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); 
Johnson
, 68 S.W.3d at 652-53.

Stated another way, when reviewing the trial court’s ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court’s ruling.  
Kelly v. State
, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court’s ruling, supports those fact findings.  
Id
. at 818-19.  We then review the trial court’s legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling.  
Id
. at 819.

Photographic Identification

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law.  
See Simmons v. United States
, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); 
Barley v. State
, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995), 
cert. denied
, 516 U.S. 1176 (1996); 
Stewart v. State
, 198 S.W.3d 60, 62 (Tex. App.—Fort Worth 2006, no pet.).  We apply a two-step analysis in order to determine the admissibility of an in-court identification: (1) whether the pretrial identification procedure was impermissibly suggestive and, if so, (2) whether the suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. 
 See Ibarra v. State
, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999), 
cert. denied
, 531 U.S. 828 (2000); 
Loserth v. State
, 963 S.W.2d 770, 771-72 (Tex. Crim. App. 1998); 
Barley
, 906 S.W.2d at 33;
 Stewart
, 198 S.W.3d at 62.  If the pretrial identification was impermissibly suggestive, the court will then consider the five factors enumerated in 
Neil v. Biggers 
to determine whether the impermissibly suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.
(footnote: 4)  409 U.S. 188, 199-200, 93 S. Ct. 375, 382 (1972). 

The first part of the analysis requires an examination of the totality of the circumstances surrounding the identification to determine if the procedure was unnecessarily suggestive.  
Barley
, 906 S.W.2d at 33; 
Webb v. State
, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988), 
cert. denied
, 491 U.S. 910 (1989).  The defendant bears the burden of establishing by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive.  
Barley
, 906 S.W.2d at 33-34.  Suggestiveness may be created by the manner in which the pretrial identification procedure is conducted.  
Id. 
at 33; 
Page v. State
, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d).  Examples of this include police pointing out the suspect or suggesting that a suspect is included in the photo lineup.  
Page
, 125 S.W.3d at 647.

Jaime’s Identification

The trial court denied Appellant’s motion to suppress after a hearing, making the following findings:
(footnote: 5) 

[Jaime] was shown a [photo lineup].  The officer asked him if he recognized anybody in there.  He said that it only took him 40 seconds or so to pick out the person that he did recognize; that this happened approximately four to five hours after he had been held up; and that the officer did not suggest to him any particular person to pick out; and told him though to make sure that he took his time and looked at the [photo lineup] before he made his choice, which he did.  So based upon all of that, I’m going to deny the Motion to Suppress the [photo lineup].

Presentation Of The Photo Lineup

In part of his second issue, Appellant contends that Jaime knew about the pawnshop and that the police had made some arrests, so that it was reasonable for Jaime to assume that at least one of the arrested suspects would be in the photo lineup and that Jaime did make that assumption.

At the beginning of the suppression hearing, Jaime said he was nervous, and his disjointed testimony reflects both this and his difficulty understanding the questions and how to respond.
(footnote: 6)  When asked whether the police told him that they had arrested someone, Jaime testified that he thought the detective said that “they didn’t have them or they didn’t got them yet, something like that.”  Defense counsel summarized, asking, “Told you, no arrests are made yet?”  Jaime agreed, “Yeah.”  He testified that he asked the detective whether they had arrested the robbers at the pawn shop and that the detective told him that they caught them but let them go.  He testified that the detective did not say anything else before showing him the photo lineup and that the police did not tell him that the person who committed the crime would be in the photo lineup, but that it was his impression that the person was in there.

The case law focuses on actions by the 
police
 that create an atmosphere of impermissible suggestion.  
See Barley
, 906 S.W.2d at 33; 
Page
, 125 S.W.3d at 647.  The testimony at the hearing reflects the trial court’s fact findings in that Jaime testified that the detective came to his work site on the afternoon of the robbery and did not suggest to him any particular person to pick out, but merely showed him the photo lineup and asked if he recognized anyone.
(footnote: 7)  He also gave Jaime some very general responses to Jaime’s questions about whether anyone had been arrested.  We conclude that, under the totality of the circumstances, the detective’s action in showing the photo lineup to Jaime was not impermissibly suggestive, and we overrule this portion of Appellant’s second issue.

Preservation Of Error

In the remaining part of his second issue, Appellant argues that the photo lineup was impermissibly suggestive because Jaime described one of the suspects as wearing a dark shirt but did not describe anyone as having a pigtail and Appellant was the only person in the lineup with a dark shirt without a pigtail.  Appellant did not present this argument to the trial court during the suppression hearing and did not raise it in his general motion to suppress.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.  Tex. R. App. P. 33.1(a)(1); 
Mosley v. State
, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
, 526 U.S. 1070 (1999).  Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court’s refusal to rule.  
Tex. R. App. P. 
33.1(a)(2); 
Mendez v. State
, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004).  Because Appellant did not present this argument to the trial court, he has not preserved it for our review.  We overrule the remainder of Appellant’s second issue.

Donald’s Identification

In part of his fourth issue, Appellant complains that Donald was aware that the robbers who stole his van had been caught and that he inferred that the robber was in the photo lineup, making it impermissibly suggestive.  The trial court conducted a hearing on Appellant’s motion to suppress Donald’s identification during the punishment phase and denied it without making any findings of fact or conclusions of law.

Presentation of the Photo Lineup

During the suppression hearing, Donald testified that his van was stolen at gunpoint during the evening of August 11, 2004, after he returned home from work.  He testified that he had just closed the front door when the doorbell rang; he opened the door and a man with a gun ordered Donald to give him his keys.  Donald testified that he handed his keys to the man, the man drove off with the van, and that a second vehicle, a dark-colored Lincoln Towncar, was driving in front of the van in a manner that made him believe that the Towncar and van thief were together.
(footnote: 8)  He testified that he reported the theft and described the man to the police as a black man wearing dark pants, with short hair, of larger build than Donald.
(footnote: 9)  The next day, a detective came to his house to show him two photo lineups, one of which was Exhibit 26, the same photo lineup as Exhibit 10, and Donald picked out the fifth photo in one of the lineups—the photo of Appellant.

 Donald testified that the detective did not suggest to him that there was a suspect in the photo lineups.  He did testify that the detective, “said something to the effect of, they have several pictures of people and I was supposed to choose one out of the group of pictures,” but that the detective did not point to any particular photograph.  He also testified that the detective said, “to look for someone that could fit the description of what [Donald] remember[ed].”  Donald testified that he did know that there were people under arrest for the crime when he looked at the photo lineups and that after he picked out the person in one of the photo lineups, the detective told him “this person was one of the—however many there were, that were picked up from another crime committed.”

Detective Manny Reyes of the Fort Worth police department, who showed the photo lineups to Donald, testified that he took the two photo lineups compiled by Detective Johnson on August 12.  Detective Reyes testified that he did not tell Donald that he was coming out to his house to show him photographs and described his technique generally and in the context of the visit as:

I just ask, pick the photo of someone you recognize or something like that.  Actually, what I do, I just hand it to him and say, look, here is [sic] some photos, take a look, see if you recognize anyone.  He looked at it.  He saw number five.  He looked at it.  He says,[“]that’s him right here.[“] I said, [“]initial the picture you are talking about.[“]  And he did.  He put his initials.  And I said, thank you.  I take [the photo lineup] back.  Everything else is blank.  I don’t fill anything out there.  Everything else is blank except for the initials under number five.  I take that, I show him [the other photo lineup].  The other one he said, “nobody here.”  I take that away, pull out my tape recorder and I said, “I need to get what happened to you yesterday.”  Push the start button and I start talking, introduce myself.  And that is all I do.

Detective Reyes also testified that he would not have told Donald that they had anybody in custody.

As discussed above, the law pertaining to photo lineups focuses on actions by police officers that create an atmosphere of impermissible suggestion.  
See Barley
, 906 S.W.2d at 33; 
Page
, 125 S.W.3d at 647.  Other than Donald’s testimony that he knew there were people under arrest when he looked at the photo lineups,
(footnote: 10) but with no explanation of how he knew, and that Detective Reyes told him after he picked out Appellant’s photo that Appellant was someone who had been picked up for a different crime, there were no major inconsistencies between Detective Reyes’ testimony and Donald’s.

The trial court had the duty to reconcile their testimony, as the sole judge of the witnesses’ credibility and the weight to be given their testimony.  Reviewing these facts in the light most favorable to the trial court’s ruling, we conclude that the trial court did not err by denying Appellant’s motion to suppress Donald’s out-of-court identification because, based on the record and how the trial court interpreted the conflicts in Donald and Detective Reyes’ testimony, there was nothing impermissibly suggestive about Detective Reyes’ presentation.  
See Kelly
, 204 S.W.3d at 818; 
Ross
, 32 S.W.3d at 855.  We overrule this portion of Appellant’s fourth issue.

In-court Identification

In the other part of his fourth issue, Appellant complains that, because Donald “openly admitted he reviewed his identification in the photo lineup shortly before trial,” his in-court identification was also based upon the impermissibly suggestive photo lineup.

Unless it is shown by clear and convincing evidence that an in-court identification of a defendant was tainted by improper pretrial identification procedures, the identification will generally be considered admissible. 
See Bruton v. State
, 921 S.W.2d 531, 534 (Tex. App.—Fort Worth 1996, pet. ref’d).  As discussed above, the trial court did not err by concluding that Donald’s pretrial identification of Appellant in the photo lineup was proper.  
See id.

For an in-court identification to be reliable, the record must clearly reflect that the witness’s observation of the accused during the offense was sufficient to serve as an independent origin for the in-court identification.  
Id
. at 534-35; 
see also Clay v. State
, 518 S.W.2d 550, 554 (Tex. Crim. App. 1975).  In determining reliability, the totality of the circumstances must be reviewed, and the following factors considered: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness’s degree of attention, (3) the accuracy of the witness’s description of the criminal, (4) the witness’s level of certainty, and (5) the length of time between the crime and the confrontation.  
Bruton
, 921 S.W.2d at 534.

Donald identified Appellant in court as the armed man who stepped into his house and demanded the keys to his van.  He testified that Appellant was approximately a foot away from him when Appellant came inside Donald’s house and pointed his gun at Donald’s stomach.  He described Appellant as being Donald’s height or taller, described some of Appellant’s clothes the night of the robbery, and testified that when Appellant came through the door, he looked at Appellant’s face.  Defense counsel asked Donald, “Would it be fair to say that from that point on [when Donald noticed the gun], you [were] pretty well focused on that gun?”  Donald responded, “No, I wasn’t staring at the gun.  I knew it was there, but I wasn’t staring at it.”

When the State asked him whether Appellant’s face was a face he would ever forget, Donald replied, “no,” even though he estimated that Appellant was only in his house for ten to twenty seconds.  When asked whether he was able to identify the man who robbed him in a photo lineup, Donald testified that he had done so the day after the robbery and that he knew when he saw Appellant’s photo “that he was the man that robbed me.”

With regard to Appellant’s contention that Donald’s in-court identification was also based upon the impermissibly suggestive photo lineup, the State asked Donald about what position the person he identified was in on the photo lineup.  Donald replied, “Number five, the 5th picture.”  The State then asked, “[A]re you going from your memory or have you seen a photo lineup recently?”  Donald said, “Yes, I saw it earlier today.”  It is unclear whether the question actually pertains to Donald’s identification of Appellant or to Donald’s memory of what position Appellant’s photograph occupied in the photo lineup.

We conclude that Donald’s in-court identification of Appellant was sufficiently reliable based on his observation of the accused during the offense: 

(1) he testified that he saw Appellant at his house, looked at Appellant’s face, and observed his height and body size; (2) he knew Appellant had the gun and responded to Appellant’s demand by handing him the van keys; (3) he was able to identify Appellant the next day from a photo lineup and testified at trial about details like Appellant’s attire the night of the robbery; (4) he testified that he would never forget Appellant’s face; and 5) it was approximately two years between the van robbery and the trial.
(footnote: 11)  
Id.
  We overrule the remainder of Appellant’s fourth issue.

FACTUAL SUFFICIENCY

In his third issue, Appellant complains that the evidence was factually insufficient.

Standard Of Review

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.  
Watson v. State
, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.  
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. 
 Watson
, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court “harbor a subjective level of reasonable doubt to overturn [the] conviction.”  
Id
.  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury’s resolution of a conflict in the evidence.  
Id
.  We may not simply substitute our judgment for the fact-finder’s.  
Johnson
, 23 S.W.3d at 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a different result is appropriate, we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.”  
Johnson
, 23 S.W.3d at 8.  Thus, we must give due deference to the fact-finder’s determinations, “particularly those determinations concerning the weight and credibility of the evidence.”  
Id
. at 9.

Evidence At Trial

The jury convicted Appellant of aggravated robbery, a robbery committed with the use or exhibit of a deadly weapon.  
See
 
Tex. Penal Code Ann. 
§ 29.03(a)(2).
(footnote: 12) 
 Jaime testified that he and Angel worked for Rene’s construction company, “T.C. Square[d].”  In August 2004, he and Angel spent four days at a job site in a residential area, repairing a concrete curb.  On August 12, he and Angel started work on the curb around 7:30 a.m.  The work involved excavating the old concrete and Jaime was face down in the gutter when, around 8:20 a.m., he heard someone order Angel to lay on the ground and then saw four black men in their twenties.  Jaime testified that one of the men had a rifle to Angel’s head.  Another of the four noticed Jaime, ran over to him, pulled a black, revolver-type gun from his pocket, and pointed it down at Jaime.

Jaime identified Appellant from a photo lineup shown to him later the same day as the man who held the gun on him.
(footnote: 13)  He testified that the man with the gun on him demanded his money and made him take off his necklace and ring, empty his pockets, and give everything to him, including his Sprint card.  One of the other men found Jaime’s wallet in Jaime’s toolbox and handed it to Appellant, who put it in his pocket with Jaime’s Sprint card.  Jaime testified that his wallet contained some credit cards, a two-dollar bill, and some Mexican money.

Jaime testified that the men also took equipment from the bed of his work truck: a generator, a shop saw, a skill saw, and a transit level, and put some of the equipment into the back of a black or dark blue Lincoln and put the generator into the car’s trunk.  Jaime described the Lincoln as having two orange stickers, one on the front windshield and one on the driver’s side window, and that the stickers were the kind used by the city to have a car removed.  He testified that when the men left, he got up right away to see if he could write down their license plate, but that it was covered with a white shirt, and then he ran to one of the neighboring houses to call 911.  He testified that a detective came out to the job site twice that day and that he got his necklace back that day.

Rene testified that Jaime called him around eight a.m. and told him that they had been robbed.  Rene was on his way to a pawn shop to look for a wrench for one of his other workers; he arrived at the pawn shop around 9 or 10 a.m. and saw his generator and some of his other equipment being unloaded from a long dark blue car by four young black men.  He testified that he knew that it was his generator because it bore one of his oval stickers with “a big T and a C and a little 2 above it” that he puts on his equipment and he went into the pawn shop to double check.  He went back to his truck and flagged down a nearby police officer, Officer Brotherton, who pulled his squad car behind Appellant’s car and asked Rene to wait outside.  Rene testified that he got his equipment back, got Jaime’s necklace back for him, and got a good look at all four men inside the pawn shop.  He testified that he did not see Appellant take equipment out of the car, but that he did see Appellant take it into the pawnshop because Appellant was the one who helped carry in the generator.

Juan, who worked at A-1 Pawn, testified that on August 12, one of the four young black men who walked into the store asked him to step outside and take a look at some of the items he had in the back of his car.  Juan testified that the items, mostly power tools including a generator, a demolition saw, and a laser level sight, were located in the trunk of a dark blue Lincoln and that he overheard the four men discussing how they were going to split the money.  He testified that the man who asked him outside was wearing dark clothing—a black shirt and either black pants or shorts—and had a gold chain around his neck with an anchor with a missing stone,
(footnote: 14) which the man also wanted to sell or pawn.

Juan testified that they had reached an agreement for the pawn shop to pay the men $350 for the equipment when one of the other pawn shop employees, a member of a citizens’ patrol group called Code Blue, alerted him that some of the merchandise might be stolen.  He testified that he was trying to explain to the men that the pawn shop would have to pass after all when the police officer arrived.  State’s Exhibit 16, the pawn shop security camera videotape from August 12, was admitted into evidence and published to the jury.

State’s Exhibit 17, the same photo lineup that was shown to Jaime, was also shown to Juan.  He picked out two of the four men: the man with the necklace and a man with him.  Juan testified that the man with the necklace was photograph #5—Appellant.  After Detective Johnson, the lead detective in this case, testified that he showed the photo lineup to Juan, it was admitted into evidence and published to the jury.

Officer Brotherton testified that, around 8:58 a.m., he received a broadcast about a robbery involving a navy blue Lincoln Towncar.  He testified that about the same time he noticed the car at the pawn shop, Rene flagged him down.  He testified that when he went into the pawn shop, everyone identified themselves correctly except for Appellant; Appellant’s true identity was determined after he was transported to records for a fingerprint ID.  He testified that Appellant and Brandon Nunley were arrested at the scene and that a Sprint card was found on Appellant.  He testified that he searched the Towncar but that he did not find any weapons.

Detective Johnson testified that he and Detective Reyes went to Jaime and Angel’s job site and spoke with them around 9:00 or 9:30 a.m.  He testified that a couple of hours later, he received a phone call directing his attention to the A-1 Pawn shop, which he estimated was approximately eight to ten miles from Jaime’s job site.  He testified that he also searched the Lincoln and did not find any weapons, but did find a letter with Appellant’s name on it and some Mexican money under the front passenger’s seat.
(footnote: 15)
 Jaime was unable to identify Appellant in court.  Rene testified that Appellant’s appearance had changed a little when he identified him in court, specifically, that Appellant looked cleaner now, a little older, and that his hair might have been a little longer in 2002.  Detective Johnson, who investigated the aggravated robbery, also testified that Appellant’s appearance had changed when he identified Appellant in court.  Specifically, Detective Johnson stated that in 2002, Appellant had braids that were combed back and was unshaven, and that now it appeared that Appellant had put on some weight.  Appellant’s sole witness, his cousin, Willie Starlling, testified that Appellant had braids in August 2002 but no longer had them, and that he was pretty sure that Appellant had put on weight since the last time he had seen him.

Willie testified that Appellant spent the night at Willie’s sister’s house with Willie and that Appellant had loaned his car, a Lincoln Towncar, to someone that Willie did not know on the day before Appellant was arrested. Willie testified that he woke up around 9 a.m. on the day of the robbery and the next time he saw Appellant’s car was around 9:30 a.m. when two men brought it back and they all went to the pawn shop.  He testified that he rode in the back seat, where he was “kind of like squashed up inside” because of the shop tools in the car, and that Appellant rode in the front passenger seat.

Willie testified that when they arrived at the pawn shop, he went inside to look for video games and that he had nothing to do with possession of stolen property.  He also testified about his various criminal convictions, including drug possession and burglary and that he had a bad memory.

Misidentification

Appellant complains that the evidence was factually insufficient because Jaime could not identify him at trial as one of the robbers and contends that that “[a] rational juror would reject the photo identification precisely because it was so result-oriented.”  We have already addressed Jaime’s identification of Appellant from the photo lineup and determined that it was not inherently unreliable.

The jury heard Jaime testify that he identified the man who held the gun on him from the photo lineup as photograph #5, only a few hours after the robbery.  Detective Johnson testified that Appellant’s photograph was photograph #5 in the photo lineup that he showed to Jaime.  Exhibit 10, the photo lineup with Jaime’s initials under Appellant’s photograph, was admitted into evidence and published to the jury.  When showed Exhibit 10 and asked if he saw anyone he recognized, Willie testified, “He looked a little familiar.  I don’t know just exactly.”  Willie testified that he and Appellant did not stop and rob anyone on the way to the pawn shop.

The jury had the responsibility to resolve the conflict in the evidence between Willie’s testimony that he and Appellant did not rob anyone and were still at Willie’s sister’s house an hour after the robbery occurred and Jaime’s testimony that man in photograph #5, Appellant, was the man who held the gun on him.  
See Johnson
, 23 S.W.3d at 12; 
Cain
, 958 S.W.2d at 407.  Viewing the evidence in a neutral light, and giving due deference to the jury’s determination of the weight to be given contradictory testimonial evidence, we cannot say that this evidence is so weak that the jury’s determination is clearly wrong and manifestly unjust or that Willie’s conflicting evidence so greatly outweighs the evidence supporting the conviction that the jury’s determination is manifestly unjust.  
See Watson
, 204 S.W.3d at 414-15, 417; 
Johnson
, 23 S.W.3d at 8-9.  We overrule this portion of Appellant’s third issue.

Robbery

Appellant claims that, to the extent there was evidence suggesting that he was fencing the stolen property, it does not follow that Appellant participated in the robbery itself or even knew where the stolen property came from.  He contends that Willie’s testimony made it impossible for either Willie or Appellant to have participated in the offense.

As discussed above, the jury had the duty to resolve contradictory testimonial evidence and to determine what weight to give that evidence based on the jury’s evaluation of the credibility and demeanor of the witnesses, here, to evaluate Willie’s testimony that he and Appellant did not rob anyone against testimony by Jaime about the theft itself, and the testimony by Rene, Juan, Officer Brotherton, and Detective Johnson about the events in the pawn shop and in the subsequent investigation.  
See Johnson
, 23 S.W.3d at 8.  Viewing the evidence in a neutral light, and giving due deference to the jury’s determinations, we also cannot say here that the evidence supporting the conviction is so weak that the jury’s determination is clearly wrong and manifestly unjust, or that the conflicting evidence so greatly outweighs the evidence supporting the conviction that the jury’s determination is manifestly unjust.  
See Watson
, 204 S.W.3d at 414-15, 417; 
Johnson
, 23 S.W.3d at 11.  We overrule the remainder of Appellant’s third issue.

LESSER-INCLUDED OFFENSE

In his first issue, Appellant complains that the trial court erred by not instructing the jury on the lesser-included offense of theft, claiming that there was evidence suggesting that he attempted to fence the stolen property and that there was evidence negating any participation by him in the armed robbery. 

Standard Of Review

We use a two-step analysis to determine whether an appellant was entitled to a lesser-included offense instruction.  
Hall v. State
, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); 
Rousseau v. State
, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 919 (1993).  First, the lesser offense must come within article 37.09 of the code of criminal procedure.  
Tex. Code Crim. Proc. Ann. 
art. 37.09 (Vernon 1981); 
Moore v. State
, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).  “An offense is a lesser-included offense if . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged.”  
Tex. Code Crim. Proc. Ann
. art. 37.09(1); 
Hall
, 225 S.W.3d at 536.  This inquiry is a question of law.  
Hall
, 225 S.W.3d at 535.  It does not depend on the evidence to be produced at the trial but is performed by comparing the elements of the offense as they are alleged in the indictment or information with the elements of the potential lesser-included offense. 
 Id
. at 525, 535-36.

Second, some evidence must exist in the record that would permit a jury to rationally find that if the appellant is guilty, he is guilty only of the lesser offense.  
Id.
; 
Salinas v. State
, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); 
Rousseau
, 855 S.W.2d at 672-73.  The evidence must be evaluated in the context of the entire record.  
Moore
, 969 S.W.2d at 8.  There must be some evidence from which a rational jury could acquit the appellant of the greater offense while convicting him of the lesser-included offense. 
 Id
.  The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence.  
Id
.  Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge.  
Hall
, 225 S.W.3d at 536.  The second prong acknowledges that there are factual circumstances in which an offense is indeed a lesser-included offense under the first prong, but a jury charge instruction will not be required because the condition—that the defendant is not guilty of the greater offense but is guilty of the lesser—is not met.  
Pickens v. State
, 165 S.W.3d 675, 679 (Tex. Crim. App. 2005); 
see also Irving v. State
, 176 S.W.3d 842, 845-46 (Tex. Crim. App. 2005); 
Hayward v. State
, 158 S.W.3d 476, 478 (Tex. Crim. App. 2005).  In such a case, the offense remains a lesser-included offense, but the trial court is not required to instruct the jury on it.  
Pickens
, 165 S.W.3d at 679. 

Theft
 
Instruction

Appellant was indicted of having “intentionally or knowingly, 
while in the course of committing theft of property 
and with intent to obtain or maintain control of said property, threaten[ed] or place[d] Jaime Hernandez in fear of imminent bodily injury or death, and . . . used or exhibited a deadly weapon, to-wit: firearm.” [Emphasis added.]  Theft is the unlawful appropriation of property with intent to deprive the owner thereof.  
See
 
Tex. Penal Code Ann. 
§ 31.03(a).  Appropriation of property is unlawful when it is without the owner’s effective consent or the property is stolen and the actor appropriates it knowing that it was stolen by another.  
See id. 
§ 31.03(b)(1), (2).  Appellant’s argument meets the first step of the analysis.  
See Hall
, 225 S.W.3d at 525, 535-36.

As to the second step of the analysis, that there must be some evidence in the record that would permit the jury to rationally find that Appellant was guilty only of theft.  A charge on the lesser-included offense is not required when the defendant presents no evidence or presents evidence that no offense was committed and there is no evidence otherwise showing that the defendant is guilty of a lesser-included offense.  
Lofton v. State
, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001).

Appellant contends that Juan’s testimony suggests that he was only attempting to sell stolen property at the pawn shop and that Willie’s testimony negated Appellant’s participation in the armed robbery and established that the pawn shop participants could have been oblivious to the fact that the property was procured at the robbery earlier the same morning.  He argues that no weapons were used or exhibited at the pawn shop and that the indictment was written broadly enough to encompass what occurred at the job site and at the pawn shop.  He claims that, absent an election by the State, he was entitled to a charge on the lesser-included offense because there was a negation of armed robbery and some evidence suggesting that he was guilty only of fencing the stolen property.

The only evidence that Appellant appropriated the property without the owner’s effective consent is Jaime’s testimony that Appellant demanded his property at gunpoint; there is no evidence in the record to establish that Appellant appropriated the property without participating in the robbery with knowledge that it was stolen by another.  
See
 
Tex. Penal Code Ann. 
§ 31.03(b)(1), (2).  If the jury believed Willie’s testimony, then Appellant did not participate in the robbery.  Nothing in Willie’s testimony or Juan’s testimony establishes that, if Appellant only went to the pawn shop and did not rob anyone, that Appellant knew that the property in the Lincoln was stolen.  Juan testified that 
he
 was alerted by one of the other pawn shop employees that the property in the Lincoln could have been stolen, but this does not establish that, if Appellant did not participate in the robbery, Appellant knew the property had been stolen.  Willie testified only that he and Appellant went to the pawn shop the next day with two other men, that the property was in the Lincoln, and that he did not know what was going on when the police arrived at the pawn shop. He testified that he could not remember what Appellant did at the pawn shop when they arrived because he went inside to look at video games.
(footnote: 16)  Therefore, because there is no evidence to show that Appellant was guilty only of theft, he was not entitled to a lesser-included offense instruction.  
See Lofton
, 45 S.W.3d at 652.  We overrule Appellant’s first issue.

HEARSAY

In his fifth issue, Appellant complains that the drug analyst-supervisor should not have been allowed to testify in the punishment phase that the substances removed from the car that Appellant was driving were marijuana and cocaine.  We review the admission of evidence under an abuse of discretion standard.  
See Wyatt v. State
, 23 S.W.3d 18, 29 (Tex. Crim. App. 2000).

Supervisor Testimony

At trial, Aracelli Uptmor, drug analyst for the Waco crime lab, testified about her educational background, that she had previously testified in state district court as an expert in the area of drug analysis on many occasions, and that she had been the drug section supervisor for two and a half years.  She also testified that drug analyst Scott Vajdos, one of her subordinates who no longer worked for the crime lab, had performed the analysis on the substances given to the lab by the Grandview Police Department.
(footnote: 17)  She explained how a drug analysis of marijuana and unknown substances would be conducted, that Vajdos performed those tests on the substances, and testified that she had reviewed Vajdos’ work and the data he had in connection with the analyses he performed on the substances.  She gave her opinion, based on what she had reviewed and the data Vajdos collected, that Exhibit 27 was marijuana and Exhibit 28 was cocaine.

Appellant contends that the admission of Uptmor’s testimony violated rule 803(8)(B) under 
Cole v. State
, 839 S.W.2d 798 (Tex. Crim. App. 1990), a case in which the court concluded that crime lab reports failed to satisfy rule 803(8)(B)’s requirements.
(footnote: 18)  
See
 839 S.W.2d at 805.  However, here, the State did not seek to admit Vajdos’ reports into evidence.  The court of criminal appeals has addressed the issue of whether the testimony of an expert who bases her opinion on a report that has been prepared by one of the expert’s subordinates is hearsay and has concluded, on facts like the case before us, that it is not.  
See Martinez v. State
, 22 S.W.3d 504, 507-08 (Tex. Crim. App. 2000).  In 
Martinez
, the court of criminal appeals held that the present opinion of a testifying witness does not constitute hearsay because it is not, and can never be, a statement other than one made by the declarant testifying at trial.  
Id
. at 508 (citing 
Aguilar v. State
, 887 S.W.2d 27, 29 (Tex. Crim. App. 1994)).  The 
Martinez
 court distinguished 
Cole
, restating the 
Aguilar
 plurality’s conclusion that the dispositive issue was whether the absent witness’s report itself was ever actually offered or admitted into evidence over the appellant’s objection as the basis for its holding that the expert’s opinion was not hearsay.  
Id
.

Since the trial court implicitly found Uptmor qualified as an expert, the State had no burden to invoke an exception to the hearsay rule.  
See id. 
at 508.  The trial court properly admitted Uptmor’s expert testimony that the substances were cocaine and marijuana because it was not hearsay and was not required to be based on her personal knowledge.
(footnote: 19)  
See id. 
 For these reasons, we hold that the trial court did not abuse its discretion by admitting Uptmor’s testimony. Accordingly, we overrule Appellant’s final issue.

CONCLUSION

Having overruled all of Appellant’s issues, we affirm the judgment of the trial court.

PER CURIAM

PANEL F:  HOLMAN, LIVINGSTON, and DAUPHINOT, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  August 24, 2007

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
See
 
Tex. Penal Code Ann. 
§ 29.03(a)(2) (Vernon 2003).

3:
Jaime and Angel are not related.  Angel gave similar testimony about the day’s events through an interpreter.

4:
These factors include: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness’s degree of attention, (3) the accuracy of the witness’s prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. 
 Biggers
, 409 U.S. at 199-200, 93 S. Ct. at 382.

5:
While neither party moved for written findings of fact and conclusions of law, and none were filed, it is apparent from the record that the trial court intended for its findings and conclusions to be expressed via its oral pronouncements.  In reviewing a motion to suppress, oral findings of fact can be considered as findings of fact on the record and given due deference.  
See, e.g., Flores v. State
, 177 S.W.3d 8, 13 (Tex. App.—Houston [1st Dist.] 2005, pet. ref’d) (reviewing trial court’s oral findings of fact on a motion to suppress), 
cert. denied
, 126 S. Ct. 2298 (2006).

The trial court’s findings of fact here are supported by the record.  Jaime testified that the detective told him that he was going to show Jaime some photos to see if he recognized anyone and handed the photo lineup to him. Jaime testified that he spent twenty to thirty seconds, or possibly thirty to forty seconds, looking at the lineup before picking out photo #5, Appellant, and initialing it.  He testified, “It didn’t take me too long to pick up that individual who I had picked.”  He identified Exhibit 10 as the photo lineup that he initialed. Jaime testified that the detective did not suggest to him that there might be several people in the photo spread that were part of the robbery, only that “he was going to show it to [Jaime] and see if [he] was able to recognize somebody from there.”  Jaime testified that he was shown the photo lineup on the same day as the robbery, about five or six hours later.

Jaime testified that after he selected photo #5, the detective asked if that was the only one.  Jaime said that he told the detective that that was the only one close to him, that he did not pay attention to the others, and that he did not know that the detective meant that there might be someone else in the photo lineup that had committed the robbery.

6:
Jaime requested that questions be repeated more than once.  The trial court repeated questions to him and instructed him to listen to the questions several times.  At one point, defense counsel even stated, “You might not be understanding my questions” before repeating the questions again.

7:
We note that even if the detective had made such a suggestion, it would be only one factor to consider in determining whether the photo lineup was impermissibly suggestive; it would not be conclusive.  
See Barley
, 906 S.W.2d at 33 (holding analysis requires examination of the totality of surrounding circumstances); 
see also Simmons 
390 U.S. at 383, 88 S. Ct. at 971 (noting chance of misidentification is heightened if police indicate one of the persons pictured committed the crime).

8:
Before the jury, he elaborated that he felt that Appellant was dropped off and that the Towncar “was waiting for him to get the van or show up, somehow, as to not leave him behind.”

9:
Donald testified that his own height was around 5 feet 10 inches and that he weighed around 145 pounds at the time.  Donald later described the man as wearing a “do-rag” and some kind of jersey.

10:
Before the jury, Donald testified that he did not remember the exact words the detective used when he presented the photo lineups, but that the detective did not say “the person that we caught is in here” or give him the impression that he was supposed to pick one.  Donald testified that he knew that the people that had done this had been caught but that he had the impression that the person who robbed him would be in the photo lineups “due to [his] own thoughts” that it was unnecessary for the detective “to bring pictures of people that weren’t suspected of doing this crime.”  Donald testified that the detective told him that he had suspects under arrest for a different offense, not for the van robbery.

11:
Additionally, the trial court instructed the jury in its charge on punishment that they could not consider testimony about extraneous offenses unless they found and believed beyond a reasonable doubt that Appellant committed such other offenses.

12:
Robbery is a theft committed while intentionally or knowingly threatening or placing another in fear of imminent bodily injury or death. 
 See id.

13:
Jaime testified that he saw the photo lineup around 3:30 that afternoon. 

14:
Jaime described his stolen necklace as “34 inches long . . . [with] an anchor with a cross on the center and three stones, three blue stones and it was missing one beside it.”  State’s Exhibit 1, a photograph of the necklace, was admitted into evidence.  Rene testified that he recognized State’s Exhibit 1 as a photograph of Jaime’s necklace.

15:
There was also testimony about a potential police error with regard to an “Errick” Washington, who was one of the four men at the pawn shop. Defense counsel suggested to Detective Johnson that it might have been “Derrick” Washington instead, to which he replied, “I don’t know.  I was never able to locate a photograph of Errick Washington or a record of him.”  He added, “Today is the first I have []ever heard of Derrick Washington.”  Defense counsel brought Jerry Rucker, the records custodian of the Tarrant County Sheriff’s Office, to lay foundation for two photographs of Derrick Washington, admitted into evidence and published to the jury.

16:
Willie agreed when the State asked him if his testimony was, “you got into [Appellant’s] car with two guys you didn’t know and some things that you don’t know what they were or where they came from and you didn’t have any part in selling at the pawn shop.”

17:
Sergeant Ruben Rivas, formerly of the Grandview Police Department, testified that he made a traffic stop of Appellant and discovered what appeared to be marijuana and cocaine in the car Appellant was driving.

18:
Rule 803(8)(B) provides that the unavailability of a declarant as a witness is immaterial for records, reports, statements, or data compilations of public offices or agencies setting forth matters observed pursuant to duty imposed by law as to which matters there was a duty to report, but excluding in criminal cases matters observed by police officers and other law enforcement personnel.  
See
 
Tex. R. Evid. 
803(8)(B).  Items that meet rule 803(8)(B) are not hearsay unless the sources of information or other circumstances indicate lack of trustworthiness.  
See id.

19:
Uptmor did testify about the weight of the cocaine and marijuana from the report, but Appellant does not specifically contend that it was error for the trial court to admit this information.  And even if Uptmor’s testimony did improperly reveal underlying facts or data that were inadmissible—for which rule 705(d) would require the trial court to give a limiting instruction upon request—no limiting instruction was requested.  
See
 
Tex. R. Evid. 
705(d) (stating that when the underlying facts or data of an expert opinion would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used for a purpose other than as explanation or support for the expert’s opinion outweighs their value as explanation or support or are unfairly prejudicial.  If otherwise inadmissible facts or data are disclosed before the jury, a limiting instruction by the court shall be given upon request).